Good morning, your honors. My name is Jason Forge. I'm here on behalf of the state of Rhode Island and the office of the Rhode Island treasurer. Thank you. I have never been more grateful to appear before this court because I've never had a more frustrating case than this one. This case has been pending for over two years and we have had to spend the majority of that time trying to correct what has been a relentless effort to revise our allegations. And that's happened all the way through appeal before this court. At this point, I've run out of metaphors, so I just want to be blunt. We have never alleged nor argued that a single software bug that was completely eradicated without anything more would be enough to sustain this case. That's not the case we've alleged far more than that. We alleged a single software bug that it took the defendants almost three years to discover. But that discovery led to the discovery of a much, much bigger problem. I want to stick to the complaint itself as much as I can because I don't want to slide into any characterizations or rhetoric because the complaint is really all that matters here. We all know that these allegations are accepted as true. Regarding the breadth of the discovery here, I would refer your honors to the very first page of the complaint itself. This is paragraph two where we discuss the discovery of this loan bug, which led to the discovery of the following. That defendants had such poor security controls and record keeping that they could not determine the scope of the data breach, identify all of the affected users, detect other data security bugs, or protect the private personal data of the tens of millions of Google Plus users. Furthermore, in this same paragraph, this discovery led to the discovery of other systemic vulnerabilities that further compromised the data security of Google Plus users. This is not an isolated reference, your honors. If we turn to page 36 of the excerpt of record, now we're at paragraph 38 of the complaint. We explain in equal detail in or about early April 2018, Google's legal and policy staff prepared a memo concerning this security breach. In this security breach, we're talking about the isolated one, including the many shortcomings in Google's security system and record keeping, which revealed previously unknown or unappreciated security vulnerabilities that made additional data exposures virtually inevitable. And then parenthetically, we explain that the three-year bug and these additional vulnerabilities are referred to as the privacy bug and the memo discussing them, the privacy bug memo. So we've staked out a very clear vision of this case, that the allegations, the vulnerabilities, the existential problem the defendants are facing is far beyond one isolated software bug. We go on in this same page in paragraph 41 to allege, and so therefore this is true, this was such a significant breach and Google's faith in its security was so shaken, the privacy bug led Pichai, and that's Google's CEO, and Page, that's Larry Page, also defendant, to approve a plan to shut down Google's Google Plus social networking site and service. Again, there's no ambiguity that we are talking about a much bigger problem. Further, in paragraph 63, which is at page 43 of the excerpts, the WSJ article, Google's blog post, and the letters described in the preceding paragraphs contained enough information for investors to piece together that the three-year bug was a symptom of the disease comprising the privacy bug. And the last example I want to give regarding the scope that's clearly set forth in the complaint is an excerpt of record 46, the end of paragraph 73, where we allege the privacy bug memo revealed systemic security deficiencies in Google's Google Plus service that rendered additional bugs and data exposures virtually inevitable. Google admitted in its October 8, 2018 blog post that it discovered and remediated the lone three-year bug in March 2018, but that was just the tip of the iceberg. So we have a much bigger problem than one isolated bug. That is clearly alleged, and that clearly must be accepted at the motion to dismiss stage. Now, regarding the significance of these inevitable data exposures, turn again to the complaint at excerpt of record page 30, paragraph 27, subsection A. These are the defendant's own words regarding how significant of a risk any compromise to their privacy protections could be. I'm quoting here from the defendant's own statements, privacy concerns relating to our technology could damage our reputation and deter current and potential users or customers from our products and services. Subsection C, concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy-related matters, even if unfounded. So we're just talking about concerns. Could damage our reputation and adversely affect our operating results. When asked, and we see at the next page, this is excerpt of record 31, paragraph 29. When asked about Google's top three competitive advantages, Google's director of security responded, well, I'd say it's security first and foremost. So we have a very big problem and in defendant's own words, a very significant problem to their business model. We also allege, your honors, that the timing of all of this could not have been worse for Google, which means could not have made these issues more significant for investors. And that's at paragraph 33, which is an excerpt of record 32, where we allege plainly by the spring of 2018, which is when all of this was happening, the trustworthiness of technology and those who control it were under unprecedented scrutiny. We then go on to explain the turn Google's data collection and privacy practices into the same hearing. So we have a big problem. Defendants acknowledging that this is precisely the type of problem that is extremely significant for their business model. And this is all occurring at the most important time in our history for this type of problem. We also allege that the individual defendants, all but defendant Larry Page, had direct knowledge of all of this information. And you can see one example for that at excerpt of record 36, page 40, paragraph 40, despite being fully briefed on the privacy bug. So that's this big hide the privacy bug from all users and everyone else outside of the companies. One of the reasons which I approved this concealment plan was because he wanted to avoid any additional regulatory scrutiny, including having to testify before Congress. We also have specific allegations regarding the direct knowledge of the other individual defendants other than defendant Page. And then perhaps most importantly, your honors, we allege that all of this is part of an overarching scheme to defraud, a scheme that is a specific basis for liability. And I'll give you just a couple examples of that. There are several throughout, but again, returning to that first page of the complaint, this is excerpt of record 22, where we're explaining this overarching problem. We say at the end of paragraph two, the Wall Street Journal led the exposure of defendants scheme, triggering government and governmental investigations, congressional hearings, and so on. This is a theme that's referred to this, we returned to multiple times in the complaint. The last one I'll mention now is, yes, there was some discussion about the extent to which the scheme liability issue was before the district court, the motion to this stage, and a question as to whether the district court ruled on this and whether it's properly before us. Could you address that, please? Yes, your honor. The issue was definitely not raised by defendants in their motion to dismiss. There's no dispute about that. In fact, when we pointed that out in our opening brief, as your honors know, the defendants responded by denying that there was even a scheme alleged below. In our reply brief, we went into great detail explaining how the scheme kicked off the entire complaint in the very first substantive allegation and continued throughout the complaint, culminating in a specific reference and citation and invocation of section 10B5 subsection A, which is scheme liability, in the specific claim. To answer your question, Judge Acuda, the district court did not rule on it. We pointed out specifically in our opposition brief that they had a very limited motion to dismiss. It did not extend the scheme liability, and defendants have conceded in their withdrawing of that argument that there was, in fact, a scheme alleged below. I appreciate you asking that question because that's the easiest way to resolve this appeal. There's no question. They did not attack. They did not challenge two of the three bases, subsection A or subsection C, which are both expressly alleged in the complaint. Those have to come back automatically. But beyond that, even the misstatements, the subsection B liability goes way beyond the single isolated bug because it wasn't just one bug. It was one bug that led to the discovery of a problem so great that they had to shut down a social networking platform that was bigger than I would love to answer any more questions, Your Honors, before I reserve. Thank you for your argument. We'll reserve the remainder of your time, and we'll hear from Alphabet. Good morning, Your Honors. My name is Ignacio Salceda, and I'm pleased to appear before you on behalf of defendants' appellees. The district court properly dismissed the complaint below for It did so on two independent grounds, and this court can affirm on either or both of them. The first ground is that the complaint failed to plead a false statement or omission, and the second is that it failed to plead the required specific facts to raise a strong inference of fraudulence. Before you get to the statement liability issues, can you address the question of what do we do with the fact that the district court failed to address at all the scheme liability that's alleged in the complaint? Respectfully, Your Honor, I think the district court did address it, and there is a lengthy footnote and a footnote one in the opinion in which the court says the calling of the allegations by multiple names does not change the underlying issue, and the underlying issue is that the plaintiffs allege that Google Alphabet made false statements in its SEC filings, and the way you can see that is in the complaint. So, for example, paragraph two of the complaint, this case arises out of defendants' misleading statements relating to data security and management integrity. That is paragraph two of the complaint at excerpt of record 22. Immediately above that, it describes the class period, which is from April to October of 2018. What's the start of the class period? The filing of Alphabet's Form 10-Q with the SEC, and the end of the class period is the blog post and the Wall Street Journal article. Again, this is about disclosures, and the fundamental point of the complaint is that Alphabet should have disclosed the bug or something else, and that something else is a moving target here because the plaintiffs allege that the bug should have been disclosed, but now my friend Mr. Forbes says, well, that's not really our theory. Our theory is much more sort of a broad-ranging issue about data security or data privacy. Well, let me get into that. What was the bug? The bug was contrary to plaintiff's about how it's a massive problem. It made certain information that was not sensitive potentially exposed. The data at issue was not social security numbers, credit card numbers, credit rating or information, or any of that kind of sensitive information. Rather, the data was profile information, much of which is already public, like occupation or a full name. Second, there is no allegation that any of that data was actually accessed and misused. There's no allegation that any user was harmed, and as Mr. Forbes admits, the bug was discovered by Google and promptly remediated before any of the disclosures at issue. And so the question becomes, fundamentally, does Google have an obligation to do a play-by-play of a remediated issue that did not cause harm to users? And getting to sort of his theme about the 10K warning, and I think this is the opposing counsel makes the point, it has very broad statements about how any breach of privacy could have imaging effects. And it says nothing about the sort of specific harms to users that you were describing. It just about disclosure of personal information or other privacy-related matters, even if unfounded, could damage our reputation, et cetera. So is there anything in the record that would show that really the issue for Google, and I guess Alphabet, has to do with the more harm and damage issues you were discussing? Yes, and if you look at the disclosure that Google had in its SEC filings, and you can see that except record 21, it talks about any system failure or compromise of our security that results in the release of our users' data could seriously harm our reputation and business. So it ties it specifically to the release of user data. Is that the same as release of social security numbers, or is it any data? Is there anything that limits it to specific information that would allow theft of users' property or identity or the like? I guess it wasn't clear to me whether it was any exposure or just specific to harm. Well, I think that your honor is getting to a key point, which is the nature of the data at issue was not sensitive. We're not talking about cases where, for example, a credit rating agency had 150 million credit ratings revealed to hackers who broke into the system, or the Heartland case, which dealt with over 100 million credit card numbers. We're not talking about that kind of data. We're not talking about sensitive data at all. Are you saying, just so I understand your argument, you're saying that Google's and Alphabet's disclosures about the effects of breaches of privacy were limited to disclosures of sensitive data, however you might describe that? It isn't stated in that way, but it is And even if unfounded, it would mean that, in theory, we would have to disclose all sorts of speculation and conspiracy theories, which might be floating around, that are unfounded. But if people believe them, then we'd have to engage in refuting each one as a game of whack-a-mole. That's not what the securities laws require. And in this instance, there is, again, no doubt that this vulnerability was discovered and promptly remediated. And in addition, and contrary to plaintiff's theory about a company that doesn't care about its user information, this was discovered through the company's proactive effort created early in 2018, bringing people from throughout the organization to do a detailed review of the company's data practices and developer access. So the opposing counsel says it wasn't just the one specific security bug, but that further studies shows that the privacy was like Swiss cheese, that there were many, many problems with the security, and points to various parts of the The response is a couple-fold, Your Honor. First, the basis of the allegations about the class period are based on the Wall Street Journal article of October 8th and the company's blog post. The Wall Street Journal article does not talk about any other bugs, let alone some huge systemic problem. What it does talk about is the company's concerted effort to review and address any issues that it might find. Are you saying that the complaint is inaccurate? I mean, do you disagree that the allegations in the complaint is that there is systemic security problems? Well, there was not a systemic security problem. Well, I'm asking about what the complaint said, because we're not finding facts here. Well, the complaint can allege, the plaintiffs can throw in all sorts of facts, but they need, especially based on the Reform Act and the securities fraud case, need to be tied to specific facts. And the sole basis of their claim that during the class period there were other problems is that Wall Street Journal article and the blog post. There, for example, no other references, there are no, you know, witnesses or others who have views on them. So during that class period, there is that one bug. The Wall Street Journal article and the blog post refer only to that bug. And there's another thing that needs to be highlighted, which is plaintiffs say that as a result of all of this, the company shut down the Google Plus product altogether. That's not correct. The company announced that it would wind down the consumer version of the product and noted that over 90% of user engagement was less than five seconds. The product did not have a significant user following among consumers. However, this same product, this Google Plus product, was available also to enterprises, which used it, and the company continued to use it, and to this day it exists. It's been given another name. But that Google Plus product for enterprises continued, and that was discussed in that blog post of October 8 as well. And I think that what this shows is not just the absence of a false statement, but also the independent basis, which the court below noted, of an absence of fraudulency under. Here, you have a company that puts together a very large working group, a task force to examine its privacy policies and third-party developer access and come up with improvements. And it also had a privacy and data protection office, which also carefully reviewed these issues. This is the antithesis of a company that doesn't care about user privacy. On the contrary, that effort not only led to the discovery of the bug, but its prompt remediation, and is the antithesis of fraudulency under. And so I think that those things need to be noted. Also, the notion that a company that's trying to improve its products and engages in that effort is somehow admitting that there's a systemic problem is wrong, because otherwise any company that tries to do better, that tries to improve, is somehow putting itself in harm's way for a security suit because it didn't say that somehow it wasn't perfect. But Google never claimed it was perfect. It said that there were risks and that it would have to deal with the risk. And if there was a real harm, it could be harmed. In this instance, before any of the challenge statements were made, that bug had been discovered and remediated. And since I only have a couple of highlights, one absence that is significant from the complaint. And while the district court below noted that it wasn't dispositive, you don't have an instance here where the individual defendant sold any stock during the period of supposed inflation in the stock. And this court has held repeatedly that absent some kind of financial incentive like that, a motive, the burden to show scienter is even higher. That's not dispositive. What is the scienter here? I mean, obviously, the complaint alleges that all of the key people read the privacy numbers of, I guess, Mr. Page, who was alleged to be in a conspiracy with Mr. Pesci. So obviously, they knew of everything that was included in the memo. So you're not Oh, I'm absolutely we're absolutely arguing that they did not have seen the memo. The memo was alleged to have been read by all of the executives. Well, but but if you look at the Wall Street Journal article, which talks about the memo, but also talks about many other things, including the decision about the bug, and the decision concerning the process that led to the bug. There is no sense that there's any kind of admission that there is scienter here. On the contrary, the fact that let's assume that all of the individual defendants, with the exception of Mr. Page knew about the memo and knew the full details. That is not scienter. On the contrary here. I'm sorry. I mean, they certainly knew about the contents of the memo, I guess. And I'm confused about what you're saying. They didn't know that. So if in fact, there was a material misrepresentation of what was in this privacy problem, or the privacy breach, then why wouldn't they have known about that? No, Your Honor, but there wasn't a material misrepresentation. And the Wall Street Journal article, which takes snippets of the memo doesn't say that there was. Well, I think the question is, if we conclude that the representations, misrepresentations were there, then there wouldn't be a problem with scienter, unlike some other types of security cases, because here there are allegations that the officers directly reviewed the memo. No, Your Honor, I don't think that that's correct, because I don't think that the memo, even assuming that you conclude that there is a material omission here. Remember, they're not alleging any misrepresentations. It's purely an omissions case. And in order to in the Brody case, they'd have to show a state of affairs that is materially at variance with the facts. And that is nowhere. They're nowhere near close to that. And so again, the fact that there are allegations that the company examined these issues and thought about these issues and had a task force and an Office of Privacy and Data Protection involved. All of these things are the antithesis of scienter. They're not a supportive scienter. I see my time is up, but I'm happy to answer any other questions the court may have. Thank you, counsel. Thank you, Your Honor. We'll let you rebuttal. Thank you, Your Honor. I'll take these in reverse order. Regarding motive, even though it's not required, we clearly alleged it at paragraph 40, Excerpt of Record 36. Despite being fully briefed on the privacy bug, Pechay approved a plan to hide the privacy bug from all users and one of the reasons he approved this concealment plan was because he wanted to avoid any additional regulatory scrutiny, including having to testify before Congress. Clearly, we allege scienter. Judge Wynn's question about the district court addressing scheme liability. That's another revisionism by defense. Defense counsel cited footnote one of the district court's order. Your Honor, as you will see in footnote one, there is absolutely no mention of the scheme liability allegation. It simply was not raised by the defendants and therefore not addressed by the district court. The harm here that we're talking about, Judge Okuda, you hit the nail on the head. It's not just social security numbers or credit card numbers. The defendants themselves said concern over data privacy is just as threatening to our business model as actual breaches and we know that that is true because at Supplemental Excerpt of Record 33, defendants themselves admitted the reason why there was low user engagement with this Google Plus platform for consumers was because users were not engaging with our APIs because of concerns around data privacy. It's not just one isolated bug. They wouldn't shut down one of the world's largest social media networks because of a fully remediated bug. One month, two months after the Wall Street Journal article, they had another exposure of 50 million users. We allege all of that. Thank you. Thank you. A case just argued will be submitted for decision. I want to thank both of you for your arguments and your briefing. Very helpful to the court and we will be in recess for the morning. Thank you. This court for this session stands adjourned.
judges: Thomas, Ikuta, Nguyen